UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EXCALIBUR VIDEO, INC.,        )
SUSAN WATSON, and         )
MICHELLE FENNELL,         )
                       )
      Plaintiffs,         )
                       )
      v.             )    11 C 1750
                       )
VILLAGE OF MELROSE PARK,     )    Judge George M. Marovich
GREG SALVI, DETECTIVE JUAN,   )
and UNKNOWN MELROSE PARK    )
POLICE OFFICERS,          )
                       )
      Defendants.       )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Michelle Fennell ("Fennell") and Susan Watson ("Watson") were arrested

during a compliance check at plaintiff Excalibur Video, Inc. ("Excalibur"). Plaintiffs filed a

five-count amended complaint against the Village of Melrose Park (the "Village"), Greg Salvi

("Officer Salvi"), Jeffrey Juan ("Officer Juan") and unknown Melrose Park Police Officers.

In Count I, plaintiff Watson seeks relief under § 1983 for false arrest. Plaintiff Fennell

makes the same claim in Count II. In Count III, Excalibur seeks relief under § 1983 for illegal

search and seizure and deprivation of property without due process. In Count IV, Excalibur

seeks a declaration that a Village Ordinance regulating adult businesses is unconstitutional, and

in Count V, it seeks to enjoin enforcement of that ordinance.

Defendants have moved for summary judgment with respect to Counts I, II and III. The

plaintiffs have moved for summary judgment on all claims. For the reasons set forth below, the

Court denies plaintiffs' motion for summary judgment. The Court grants in part and denies in

part defendants' motion for summary judgment.

## I.    **Background**

Unless otherwise noted, the following facts are undisputed.[1]

Plaintiff Excalibur is a corporation managed by Robert Palombo ("Palombo") and Louis Messina ("Messina").  In 1990, Excalibur began operating as an adult book and video store, and it has added additional services over the years.  During the relevant time period, Excalibur employed plaintiff Watson as a cashier.  From January 2010 through April 21, 2010, plaintiff Fennell worked at Excalibur as an independent dancer, which is to say that Excalibur did not consider her an employee.

Defendant Officers Salvi and Juan were, at all relevant times, police officers employed by defendant Village of Melrose Park (the "Village").

The Village of Melrose Park ("the Village"), in which Excalibur sits, regulates adult businesses within the district.  In 2004, the Village enacted Ordinance No. 837, which established licensing requirements for the adult-entertainment businesses located within the Village.  Ordinance No. 837 was codified in the Village of Melrose Park Municipal Code as Chapter 5.08 ("Village Municipal Code 5.08").  Village Municipal Code 5.08 states, in relevant part:

---

[1]Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment.  As the Court notes on its website (and has mentioned in multiple opinions), the Court enforces Local Rule 56.1 strictly.  Facts that are argued but do not conform with the rule are not considered by the Court.  For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed.  Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted.  *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004).  It is not enough at the summary judgment stage for either party to *say* a fact is disputed.  The Court considers a fact disputed *only* if both parties put forth admissible evidence of his or its version of the fact.  Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

WHEREAS the Village of Melrose Park, Illinois (the "Village") has reviewed and analyzed numerous studies, reports, articles, judicial decisions, and the experience and the legislative findings of other counties and municipalities in the Chicago metropolitan region and around the country concerning the impact, or "secondary effects," of sexually oriented businesses and the sale, distribution, and display of sexually oriented materials (collectively, "Sexually Oriented Business Activities") on the areas in which such Activities are located or take place; and

WHEREAS, Sexually Oriented Business Activities can cause or contribute significantly to increases in criminal activity in the areas in which they are located or take place, thereby taxing crime prevention, law enforcement, and public health services; and

WHEREAS, Sexually Oriented Business Activities encourage prostitution, attracts or encourages other related criminal activity, increases the public health and safety risks associated with Sexually Oriented Business Activities, and otherwise causes or contributes significantly to the adverse impacts and secondary effect of Sexually Oriented Business Activities on the areas in which such Activities are located or take place; and

\*   \*   \*

WHEREAS, the conduct of Sexually Oriented Business Activities, including specifically, but without limitation, adult cabarets that provide nude dancing and other similar conduct and the operation and use of adult booths, often encourages or allows sexual activities and prostitution, among other things, that place employees and patrons of such businesses at risk to exposure and contraction of sexually transmitted diseases, including specifically, but without limitation, the HIV virus, Acquired Immune Deficiency Syndrome, and venereal diseases; and

WHEREAS, the President and Members of the Village Board of Trustees have determined that Sexually Oriented Business Activities will, unless properly regulated, have these and other severe adverse impacts and secondary effects on the Village and its residents; and

WHEREAS, for the reasons set forth above, among others, the President and Members of the Village Board of Trustees have found and determined that it is essential to the health, safety, and general welfare of the Village and its residents to adopt comprehensive licensing regulations relating to Sexually Oriented Business Activities, to the distribution and display of sexually oriented materials, and to the types and operations of sexually oriented businesses that may be located in the Village; and

* * *

WHEREAS, the President and Members of the Village Board of Trustees have further found and determined that the establishment of the regulations provided in this Ordinance on the operation, maintenance, and structural aspects of Sexually Oriented Business Activities is necessary to minimize to the greatest extent possible, or to eliminate altogether, the public health and safety risks that customarily, but unnecessarily, exist in connection with such Activities;

* * *

NOW THEREFORE, BE IT ORDAINED by the Village President and Board of Trustees of the Village of Melrose Park, Cook County Illinois, as follows:

* * *

**ARTICLE II.
LICENSING**

* * *

<u>**Section 3.**</u>     <u>**Definitions.**</u>

For purposes of this Ordinance, the following terms, phrases and words shall have the meanings given herein.

* * *

B.     <u>Adult Entertainment Establishment.</u>   Any of the following Commercial Establishments, as defined herein:

   1.     Adult Cabaret.  Any Commercial Establishment that as a substantial or significant portion of its business features or provides any of the following:

      (a)     Persons who appear Semi-Nude.

      (b)     Live performances that are distinguished or characterized by an emphasis on the exposure, depiction, or description of Specialized Anatomical Areas or the conduct or simulation of Specified Sexual Activities.

-4-

(c)     Films, motion pictures, video or audio cassettes, slides, computer displays, or other visual representations or recordings of any kind that are distinguished or characterized by an emphasis on the exposure, depiction, or description of Specified Anatomical Areas, or the conduct or simulation of Specified Sexual Activities.

2.     Adult Store.  Any Commercial Establishment (a) that contains one or more Adult Booths; (b) that as a substantial or significant portion of its business offers for sale, rental, or viewing any Adult Materials; or (c) that has a segment or section devoted to the sale or display of Adult Materials.

3.     Adult Theater.  Any Commercial Establishment that as a substantial or significant portion of its business features or provides (I) films, motion pictures, video or audio cassettes, slides, or other visual representations or recordings that are distinguished or characterized by an emphasis on the exposure, depiction, or descriptions of Specified Anatomical Areas, or the conduct or simulation of Specified Sexual Activities; or (ii) live performances that are distinguished or characterized by an emphasis on the exposure, depictions, or description of Specified Anatomical Areas or the conduct or simulation of Specified Sexual Activities.

* * *

N.     Nude or State of Nudity.     A state of dress or undress that exposes to view (I) less than completely and opaquely covered human genitals; pubic region; anus; or female breast below a point immediately above the top of the areolae, but not including any portion of the cleavage of the female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel, provided the areolae is not exposed; . . .

* * *

P.     Semi-Nude.     A state of dress or undress in which clothing covers no more than the genitals, pubic region, and areolae of the female breast, as well, as portions of the body covered by supporting straps or devices or by other minor accessory apparel such as hats, gloves, and socks.

\* \* \*

## Section 5.  Adult Establishment Licenses Generally

A.  <u>Adult Establishment License Required.</u>  An Adult Establishment License shall be required to establish, operate, or maintain an Adult Entertainment Establishment within the Village.

\* \* \*

C.  <u>Operation in Violation of License Prohibited.</u>  It shall be unlawful for any Licensee to establish, operate, or maintain an Adult Entertainment Establishment within the Village except in the manner authorized by, and in compliance with, the provisions of this Ordinance and the Licensee's Adult Establishment License.

\* \* \*

## Section 6.  Form and Submittal of License Application.

\* \* \*

C.  <u>Required Information and Documents.</u>  Each application shall include the following information and documents:

\* \* \*

10.  The specific type or types of Adult Entertainment Establishment(s) that the applicant proposes to operate in the Licensed Premises.

\* \* \*

## Section 9.  Inspections by the Village.

The Adult Use Commissioner and other Village representatives and departments with jurisdiction shall periodically inspect all Adult Entertainment Establishments as shall be necessary to determine compliance with the provisions of this Ordinance and all other applicable law.

\* \* \*

## Section 11.  Regulations Applicable to All Adult Entertainment Establishments.

*   *   *

F.    <u>Specific Prohibited Acts</u>. . . . No Adult Establishment employee or Adult Establishment Patron or any other person shall be and/or appear Nude or in a State of Nudity in an Adult Entertainment Establishment. . . .

*   *   *

K.    <u>Manager's Station</u>.  Each Adult Entertainment Establishment shall have one or more manager's stations.  The interior of each Adult Entertainment Establishment shall be configured in such a manner that there is a direct and substantially unobstructed view from at least one manager's station to every part of each area, except restrooms, of the Establishment to which any Adult Establishment Patron is permitted access for any purpose.

## Section 12.    Special Regulations for Adult Booths.

*   *   *

C.    <u>Open Booth Requirement</u>.     In addition to satisfying the requirement of Subsection 11.K of this Ordinance, all Adult Stores containing Adult Booths shall be physically arranged in such a manner that the entire interior portion of each Adult Booth shall be visible from the common area of the Adult Store.  To satisfy this requirement, there shall be a permanently open and unobstructed entranceway for each Adult Booth and for the entranceway from the area of the Adult Store that provides other Adult Materials to the area of the Adult Store containing the Adult Booths.  Each of these entranceways shall not be capable of being closed or obstructed, entirely or partially, by any door, curtain, partition, drapes, or any other obstruction whatsoever that would be capable of wholly or partially obscuring the area of the Adult Store containing the Adult Booths or any person situated in an Adult Booth.  It shall be unlawful to install Adult Booths within an Adult Entertainment Establishment for the purpose of providing secluded viewing of Adult Materials or live performances.

*   *   *

E.    <u>Holes Prohibited.</u>     Except for the open Booth entranceway, the walls and partitions of each Adult Booth shall be constructed and maintained of solid walls or partitions without any holes or openings whatsoever.

-7-

  F.  <u>Signage</u>.  A sign shall be posted in a conspicuous place at or
near the entranceway to each Adult Booth that states (I) that only
one person is allowed in an Adult Booth at any one time, (ii) that it
is unlawful to engage in any Specified Sexual Activities while in
an Adult Booth, and (iii) that it is unlawful to damage or deface
any portion of an Adult Booth.

*   *   *

(Village Municipal Code 5.08).

   In 2005, Excalibur installed ten booths for watching adult videos. Each of those ten

video booths had a door which could be closed. At various points, the walls between the booths

contained holes. At various points, Excalibur patched the holes.

   In 2009, Excalibur added three adult booths that are used for the purpose of viewing live

entertainment. As of January 2010, each of the three live-entertainment booths had a door which

could be closed. Excalibur advertised within the store and in "Gentleman's Pages" (it is not

clear from the record what that means) in order to let customers know that dancers would appear

nude or semi-nude. In the live-entertainment booths, customers paid Excalibur a fee in order to

see live dancing. Excalibur kept all of those fees for itself; the dancers (of which plaintiff

Fennell was one) received no portion of the fees the customers paid. The dancers, though,

sometimes received tips for taking off their clothes. Customers could tip a dancer $10 to see her

topless and between $20 and $30 to see her dance nude. Specifically, dancers would ask a

customer if he wanted to see her nude or semi-nude, and the customer would place the relevant

tip into a tip box. During the time period when she worked at Excalibur, Fennell appeared nude

and semi-nude at Excalibur.

   During the relevant time period, Excalibur employed plaintiff Watson as a cashier. From

where Watson sat as cashier at the manager's station within Excalibur, she could not see inside

-8-

the adult booths that were used for watching adult videos. Nor could Watson see into the booths used for live performances.

In 2010, Excalibur applied for and was granted an adult entertainment license. On its application, when asked to list the "Type of Business" for which it requested a license, Excalibur stated "ADULT BOOKSTORE/VIDEO STORE." Excalibur's application did not say it was requesting a license to be an adult Cabaret.

Meanwhile, defendant Officers Salvi and Juan reported to Sergeant Anthony Greco ("Greco"), another police officer employed by the Village of Melrose Park. Sergeant Greco began receiving complaints after a second adult entertainment business (the first being Excalibur) opened in the Village. Sergeant Greco opened an investigation file on both adult businesses, including Excalibur. Sergeant Greco's investigation revealed, among other things: (a) a Craigslist posting in which an unknown person offered oral sex in Excalibur booths; (b) internet and magazine advertisements in which Excalibur advertised dancers performing nude and semi-nude; and (c) the fact that Excalibur had applied for a license to be an adult bookstore, not a Cabaret.

On February 12, 2010, Sergeant Greco and Officer Juan (together with other officers from the Village Police Department) conducted a premises check at Excalibur. The officers discovered doors on the adult booths, holes between the booths and a dancer dressed in a bra and panties. The officers also found that from the manager's station, the manager could not see all of the areas customers could access. The officers: (1) ordered that Excalibur close for the remainder of the evening; and (2) issued a number of citations. For example, the officers cited Excalibur for having doors on adult booths and holes between the booths. The officers cited Excalibur for providing live entertainment without a Cabaret license. Excalibur's managers

(Palombo and Messina) discussed the citations.  Still, Excalibur did not respond to the citations other than to patch the holes between the adult booths.

On March 17, 2010, Sergeant Greco and other Village police officers conducted another premises check at Excalibur.  Once again, the officers observed doors on the adult booths and holes in the partitions between the booths.  The officers noticed that the required signs were not present on the booths.  The officers observed a dancer available for live dancing.  Once again, the officers issued citations to Excalibur for violations of Village Municipal Code 5.08. Specifically, the officers issued citations for operating a Cabaret without a license, for having doors on adult booths and for having holes between the booths.  The officers handed the citations to plaintiff Watson (who, later, gave them to Excalibur's managers) and ordered Excalibur closed for the rest of the night.

Excalibur did not respond to the tickets.

On April 21, 2010, Sergeant Greco directed Officer Salvi to perform another premises check at Excalibur.  Sergeant Greco told Officer Salvi that he had received complaints about live dancing.  Sergeant Greco informed Officer Salvi that Excalibur had been issued citations previously, to no apparent effect.  Sergeant Grego told Officer Salvi that he should make arrests if violations existed at Excalibur.  Officer Salvi saw Excalibur's license application, on which Excalibur stated it was applying for a license for an adult bookstore and adult video store.

Officers Salvi and Juan conducted the premises check on Excalibur on April 21, 2010. Among other things, Salvi and Juan observed many of the same violations Excalibur had been cited for previously.  For example, Salvi and Juan observed doors on the adult booths and holes in the walls between the booths.  The officers noticed that from where Watson sat at the manager's booth, she could not see into the adult booths.  They noticed the absence of the required signs on the adult booths.

In addition, Officers Salvi and Juan observed a cork board on which was placed a list of the prices for which dancers would appear topless and bottomless.  They saw photographs in which dancers were nude and a sign that said "live dancing."  They saw a DVD playing a video of plaintiff Fennell dancing, sometimes in the nude.  Officer Salvi seized the corkboard, the "live dancing" sign and the DVDs.  Officer Juan was not involved in the decision to seize those items.

When Officers Salvi and Juan arrived that evening, they did not see any live dancing.  Fennell, the dancer, was in a dressing room, perhaps asleep (the parties dispute whether she was awake).  When the officers saw her, Fennell was wearing a bikini top and a mini-skirt.  Although she was not dancing when the officers arrived, Fennell had danced in the nude for a customer that evening (before the police arrived), and her tip for appearing nude was still in the tip box, a fact which Officer Salvi observed.

Officer Salvi arrested Fennell and Watson but did not tell them why they were being arrested.  At the station, Officer Salvi signed a criminal complaint charging Fennell with public indecency.  He did so based on the manner in which she was dressed, her admission that she had danced that night, the money in the tip box and the advertising at Excalibur.  As to Watson, Officer Salvi signed a criminal complaint charging Watson with a public nuisance and for maintaining a place of prostitution.  Officer Salvi believed that prostitution could occur inside the adult booths due to the seclusion provided by the doors on the adult booths and the holes between the booths.  Based on Officer Salvi's experience, such holes were called "glory holes" and were sometimes used for prohibited sexual activities.

Excalibur posted bond for Fennell and Watson, who were released from custody.  Later, the charges against Fennell and Watson were stricken with leave to reinstate.

## II.    **Summary judgment standard**

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III.  Discussion

#### A.  The Constitutionality of Village Municipal Code 5.08

In Counts IV and V, Excalibur challenges the constitutionality of Village Municipal Code 5.08. In moving for summary judgment on this claim, Excalibur argues that one section of the ordinance–the prohibition on nudity–is unconstitutional. The relevant portion of the ordinance states, "No Adult Establishment employee or Adult Establishment Patron or any other person shall be and/or appear Nude or in a State of Nudity in an Adult Entertainment Establishment." (Village Ordinance 5.08 at Section 11.F.). Excalibur does not argue that any other portion of the ordinance is unconstitutional.

The primary problem with Excalibur's challenge to the nudity ban is a long line of cases upholding such bans. *Erie v. Pap's A.M.*, 529 U.S. 277, 301 (2000) (upholding a nudity ban and explaining "any incidental impact on the expressive element of nude dancing is *de minimis*."); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991) (upholding ban on public nudity and

explaining that "the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic").  In *Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000), the Seventh Circuit considered the constitutionality of a prohibition on "appear[ing] in a state of nudity" in sexually-oriented businesses.  Although the Seventh Circuit recognized that the nudity ban, by applying only to sexually-oriented businesses, "effectively bans commercial nude dancing," it relied on *Barnes* and *Erie* in concluding that "[i]nsofar as it prohibits full nudity and requires dancers to wear pasties and G-strings while performing, [the nudity ban] does not offend the First Amendment." *Schultz*, 228 F.3d at 846-47.  The Seventh Circuit, thus, upheld the ban on full nudity in sexually-oriented businesses. *Id.* at 848.  Excalibur does not argue that the nudity ban in the Village's ordinance is in any way distinguishable from the nudity bans upheld in those cases.

Instead, Excalibur argues that the section is invalid because the Village has not produced evidence to support its rationale for the nudity ban.  The Court disagrees with Excalibur's argument as to the Village's evidentiary burden.  The Village was not required to perform its own studies and submit them to this Court; it was entitled to rely on evidence of secondary effects described in other cases.  As the Supreme Court explained in *Erie*:

> And in terms of demonstrating that such secondary effects pose a threat, the city need not 'conduct new studies or produce evidence independent of that already generated by other cities' to demonstrate the problem of secondary effects, 'so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.' *Renton v. Playtime Theatres, Inc.*, [475 U.S. 41] at 51-52, 106 S.Ct. 925 [(1986)].  Because the nude dancing at Kandyland is of the same character as the adult entertainment at issue in *Renton*, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed. 310 (1976), and *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.3d 2d 342 (1972), it was reasonable for Erie to conclude that such nude dancing was likely

to produce the same secondary effects.  And Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theatres* to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood.  . . .

In any event, Erie also relied on its own findings.  The preamble to the ordinance states that 'the Council of the City of Erie *has, at various times, over more than a century, expressed its findings* that certain lewd, immoral activities carried on in public places for profit are highly detrimental to the public health, safety and welfare, and lead to the debasement of both women and men, promote violence, public intoxication, prostitution and other serious criminal activity." . . . The city council members, familiar with commercial downtown Erie, are the individuals who would likely have had firsthand knowledge of what took place at and around nude dancing establishments in Erie, and can make particularized, expert judgments about the resulting harmful secondary effects.  Analogizing to the administrative agency context, it is well established that, as long as a party has an opportunity to respond, an administrative agency may take official notice of such 'legislative facts' within its special knowledge, and is not confined to the evidence in the record in reaching is expert judgment.  Here, Kandyland had ample opportunity to contest the council's findings about secondary effects–before the council itself, throughout the state proceedings, and before this Court.  Yet to this day, Kandyland has never challenged the city council's findings or cast any specific doubt on the validity of those findings.  Instead, it has simply asserted that the council's evidentiary proof was lacking.  In the absence of any reason to doubt it, the city's expert judgment should be credited.

*Erie*, 529 U.S. at 296-98 (emphasis in original) (internal citations).  The Supreme Court cited

that portion of *Erie* when it summarized the evidentiary burden:

We held that a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest.  This is not to say that a municipality can get away with shoddy data or reasoning.  The municipality's evidence must fairly support the municipality's rationale for the ordinance.  If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*.  If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies the ordinance.

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-39 (2002) (internal citations

omitted); *see also Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 464 (7th Cir. 2009).

Contrary to Excalibur's suggestion that the Village must proffer to this Court evidence to

support its rationale for the nudity ban, the Court does not read these cases to require the

municipality to submit all of its evidence to the Court so that the Court may re-weigh the

evidence. *See G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631, 639 (7th Cir. 2003)

("*Alameda Books* does not require a court to re-weigh the evidence considered by a legislative

body, nor does it empower a court to substitute its judgment in regards to whether a regulation

will best serve a community, so long as the regulatory body has satisfied the *Renton* requirement

that it *consider* evidence 'reasonably believed to be relevant to the problem' addressed. . . .

Wrote Justice Kennedy [in his concurrence], 'as a general matter, courts should not be second-

guessing fact-bound empirical assessments of city planners. . . . the Los Angeles City Council

knows the streets of Los Angeles better than we do.'") (emphasis added).  Rather, it is enough

that the preamble shows that the municipality considered evidence relevant to the problem.  The

preamble specifically states that the Village reviewed studies, the legislative findings of other

counties and judicial decisions.  The nudity ban at issue here is essentially the same as the ones

at issue in *Erie*, *Barnes* and *Schultz*, so it was reasonable for the Village to rely on those judicial

decisions in concluding that nudity was likely to produce the same negative secondary effects.

*Erie*, 529 U.S. at 296-97 ("Because the nude dancing at Kandyland is of the same character as

the adult entertainment at issue in *Renton*, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50,

96 S.Ct. 2440, 49 L.Ed. 310 (1976), and *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34

L.3d 2d 342 (1972), it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects.").

Given the preamble explaining the rationale, it is Excalibur, not the Village, who, at this stage, must "cast doubt on [the Village's rationale], either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." *Alameda Books*, 535 U.S. at 438-39. Here, Excalibur has not cast doubt on the Village's rationale for the nudity ban, which, as the Supreme Court and the Seventh Circuit have recognized about similar bans, is a *de minimis* restriction that leaves ample room for a dancer's erotic message.

Excalibur has not shown that it is entitled to judgment as a matter of law on Counts IV and V. Its motion for summary judgment on these claims is, therefore, denied.

### B. Unknown officers

In their amended complaint, plaintiff asserted Counts I, II and III against all defendants, including "unknown Melrose Park Police Officers." Plaintiffs did not name and serve the unknown defendants before the expiration of the two-year statute of limitations. Accordingly, defendants' motion for summary judgment as to plaintiffs' claims against unknown defendants is granted. *Forman v. Richmond Police Dep't.*, 104 F.3d 950, 965 (7th Cir. 1997).

### C. Fennell's claim for false arrest

In Count II, plaintiff Fennell seeks relief under § 1983 for false arrest. Defendants and plaintiff, alike, move for summary judgment on Count II.

Defendants have put forth undisputed evidence that it was Officer Salvi, not Officer Juan, who arrested Fennell. Officer Juan is not liable for Officer Salvi's actions. *See Vance v. Peters*,

97 F.3d 987, 991 (7th Cir. 1996) (An individual can be liable under § 1983 only if he caused or participated in the constitutional deprivation). Officer Juan is entitled to judgment as a matter of law on this claim and is, therefore, granted summary judgment on Count II.

As for Officer Salvi, he argues that he had probable cause to arrest Fennell. Probable cause for arrest is an absolute defense to plaintiff's false arrest claim. *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006). "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer *at the time of the arrest* would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 714 (7th Cir. 2013) (emphasis added). "[A]lthough it requires something more than a hunch, probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity–the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott*, 705 F.3d at 714. "Officers are also afforded an extra layer of protection through the defense of qualified immunity (also known as arguable probable cause)." *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012). In false arrest cases, officers are entitled to qualified immunity where a reasonable officer could have mistakenly believed that probable cause existed. *Id.* Whether or not probable cause (or arguable probable cause) exists "depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Abbott*, 705 F.3d at 715.

Although Fennell was charged with indecent exposure, probable cause for any crime–not just the one for which she was arrested–will suffice. *See Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any*

crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause.") (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2007)).  The offense need not be a major offense.  *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001); *see also Thomas v. City of Peoria*, 580 F.3d 633, 638 (7th Cir. 2009) ("[T]he Fourth Amendment does not forbid an arrest for a 'nonjailable' offense.  Even arrests for violations of purely civil laws are common enough, and usually unexceptional–examples that spring to mind are arrests for civil violations of immigration laws (such as overstaying a visa) and for civil contempt.") (internal citations omitted).

Here, the Court concludes that a reasonable officer could have believed that Fennell had violated the nudity ban in Village Ordinance 5.08.  Although Officer Salvi did not see Fennell in a state of nudity, he observed evidence that would lead a reasonable person to believe Fennell had been nude that evening.  First, Officer Salvi observed a DVD playing a recording of Fennell dancing, sometimes in the nude.  Officer Salvi also saw a sign that listed the prices for which dancers would appear topless and bottomless.  He also saw, in the tip box, Fennell's tip for having appeared nude earlier in the evening.  From this, a reasonable officer could conclude that Fennell had violated Village Ordinance 5.08 by appearing nude at an Adult Establishment.

There are no issues of material fact, and Officer Salvi is entitled to judgment as a matter of law.  Defendants' motion for summary judgment on Count II is granted, and plaintiff's motion for summary judgment on Count II is denied.

### D.	Watson's claim for false arrest

In Count I, Watson seeks relief under § 1983 for false arrest.  Watson was arrested for maintaining a public nuisance, the nuisance being keeping a place of prostitution.

As was true with the arrest of Fennell, it is undisputed that Officer Salvi arrested Watson. Officer Juan is not liable for Officer Salvi's conduct, and Officer Juan is granted summary judgment on Count I.

Officer Salvi, for his part, argues that he had probable cause to arrest Watson. Watson argues that he did not. Each wants the Court to enter summary judgment in his or her favor.

The offense of keeping a place of prostitution was, as of the time Watson was arrested for the offense, defined as follows:

> (a) Any person who has or exercises control over the use of any place which could offer seclusion or shelter for the practice of prostitution who performs any of the following acts keeps a place of prostitution:
>
>> (1) Knowingly grants or permits the use of such place for the purpose of prostitution; or
>>
>> (2) Grants or permits the use of such place under circumstances from which he could reasonably know that the place is used or is to be used for purposes of prostitution; or
>>
>> (3) Permits the continued use of a place after becoming aware of facts or circumstances from which he should reasonably know that the place is being used for purposes of prostitution.

720 ILCS 5/11-17 (West 2002).[2]

 A reasonable jury could conclude that Officer Salvi had probable cause to arrest Watson, but it could also reasonably reach the opposite conclusion. Officer Salvi was reasonable in thinking that the adult booths in Excalibur could offer seclusion for prostitution. Officer Salvi saw that the adult booths at Excalibur had doors that closed and had holes in the walls between the booths. He knew that other officers had twice issued citations to Excalibur for the doors and

---

[2]A prohibition on similar conduct is now codified at 720 ILCS 5/11-14.03 (based on the definition in 720 ILCS 5/11-.01).

holes.  Officer Salvi knew, from his police experience, that the holes between the booths were sometimes called "glory holes" and used for illegal sexual activities.  Officer Salvi was also aware of a Craiglist posting offering oral sex in the adult booths at Excalibur.  Thus, he had reason to believe the adult booths could offer seclusion for prostitution.  Despite this, Watson argues that Officer Salvi could not have had probable cause to arrest her without evidence that she was cooperating with a prostitute.  *See People v. Laws*, 155 Ill.2d 208, 216 (Ill. S.Ct. 1993) ("The underlying crime [of keeping a place of prostitution] contemplates cooperative conduct between a prostitute and a "person who has or exercises control over the use of any place which could offer seclusion or shelter for the practice of prostitution.'").  The Court disagrees.  As Officer Salvi points out, in *Laws*, the defendant was charged with violating 11-17(a)(1), which requires a person to "knowingly" grant or permit the use of premises for prostitution.  *Laws*, 155 Ill.2d at 210.  The statute contained two other sections that do not require cooperation with a prostitute.  Under 11-17(a)(2), for example, it was a crime to grant use of a place "under circumstances from which he could reasonably know that the place is used or is to be used for purposes of prostitution."  Officer Salvi has put forth evidence that Watson knew the adult booths had both doors and holes in the walls between the booths:  not only was Watson working as a cashier at Excalibur, but she also is the person to whom the officers had handed Excalibur's citations for those very issues on at least one prior visit.  Whether all of this adds up to probable cause is a close question, which a jury will have to resolve.

Because a reasonable jury could return a verdict for either party based on the facts each side has put forth, neither party is entitled to judgment as a matter of law.  Plaintiff's motion for

summary judgment on Count I is denied, as is Officer's Salvi's motion for summary judgment on Count I.

      **E.**      **Excalibur's search and seizure claim**

In Count III, Excalibur seeks relief under §1983 for two things: (1) unreasonable seizure and (2) deprivation of property without due process. The Court will consider them in turn.

First, Excalibur alleges that defendants unreasonably seized its property on April 21, 2010. Specifically, Excalibur wants compensation for the fact that Officer Salvi seized the corkboard that listed the prices customers had to pay to see dancers appear topless and bottomless, the DVD of Fennell dancing (sometimes in the nude) and a sign that said, "live dancing." Both sides seek summary judgment on this part of Count III.

With respect to its unreasonable seizure claim, Excalibur concedes that the officers had the right to conduct a search at Excalibur on April 21, 2010. Thus, it was reasonable for officers to seize incriminating evidence in plain view. *See Horton v. California*, 496 U.S. 128, 136-137 (1990); *Arizona v. Hicks*, 480 U.S. 321, 325-27 (1987). Excalibur argues, though, that the officers could not seize the evidence because the evidence was *not* incriminating, and, therefore, they should have obtained a warrant before the seizure. The Court disagrees. The Court has already concluded that Officer Salvi had probable cause to arrest Fennell for violating the Village's prohibition on nudity in adult entertainment businesses. The evidence Officer Salvi seized in this case was evidence of that offense. Accordingly, it was reasonable, as a matter of law, for Officer Salvi to seize the items. Officer Salvi is entitled to judgment as a matter of law on this claim. Because Officer Juan was not involved in the seizure the items, he, too, is entitled to judgment as a matter of law. Without an underlying constitutional violation, the Village, too,

is entitled to judgment as a matter of law with respect to Excalibur's *Monell* claim against it. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010).

The second part of Excalibur's third count is its due process claim. In its first amended complaint, Excalibur alleged that defendants interfered with its business by forcing it to close for the evening on the three occasions (February 12, 2010; March 17, 2010 and April 21, 2010) when Village officers conducted premises checks. In each instance, the officers ordered Excalibur to close for the remainder of the evening after they cited it for violations of Village Ordinance 5.08. Excalibur argues that those closings constituted a deprivation of its property without due process of law. Excalibur likens itself to the plaintiff in *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983), where the Seventh Circuit concluded that the plaintiff had a property interest in its liquor license. The Seventh Circuit also said, "if it is true as alleged that through harassment of customers and employees and relentless, baseless prosecutions the defendants destroyed the value of the plaintiffs' license business and forced them ultimately to give up their Class A license, the plaintiffs were deprived of their property right in the license even though the license was never actually revoked." *Reed*, 704 F.2d at 949. In other words, the Seventh Circuit, in *Reed* was recognizing a sort of constructive or de facto revocation. Excalibur seems to think that forcing it to close on three occasions (but not revoking its license), likewise would be considered a de facto revocation of its adult entertainment license. (The Court will assume without deciding–because neither party makes an issue of it–that Excalibur has a property interest in its adult entertainment license.)

Defendants argue that Excalibur cannot show a deprivation, because three short closings does not amount to destruction of Excalibur's license. On this point, defendants take support

from *Chicago United Industries LTD v. City of Chi.*, 669 F.3d 847 (7th Cir. 2012), where the plaintiff claimed that the City deprived them of their property interest in their Minority Business Enterprise ("MBE") certification by reducing its purchases from them for five months. In affirming the grant of summary judgment to the defendant, the Seventh Circuit explained:

> Although [plaintiff's] certification as an MBE was never revoked, there would be de facto revocation, which is treated the same under the due process clause, if the City 'destroyed the [certification's] value.' But diminution is not destruction, and diminution is all the company has shown. . . . True, it had nowhere near the success that it had had before and would have again, and we can assume that the City's hostility was the reason it lost money during the five-month period. But temporary losses are common in business, and do not equate to destruction.

*Chicago United*, 669 F.3d at 851 (internal citations omitted).

Here, Excalibur has not put forth sufficient evidence from which a reasonable jury could conclude that the defendants destroyed its license. All Excalibur has established is that defendants ordered it to close for three evenings. Three one-night closures do not constitute destruction. Defendants are entitled to judgment as a matter of law on Excalibur's due process claim.

For these reasons, plaintiffs' motion for summary judgment with respect to Count III is denied. Defendants' motion for summary judgment with respect to Count III is granted.

## IV.    <u>Conclusion</u>

For the reasons set forth above, the Court denies plaintiffs' motion for summary judgment. Defendants' motion for summary judgment is granted in part and denied in part. The unknown defendants are granted summary judgment on Counts I, II and III and are hereby dismissed from this case. Defendant Juan is granted summary judgment on Counts I, II and III and is hereby dismissed from this case. Defendant Salvi is granted summary judgment on

Counts II and III.  Defendant Village of Melrose Park is granted summary judgment on Count

III.

ENTER:

George M. Marovich
United States District Judge

DATED:  May 14, 2013